UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

MAGALY BERNADOTTE,

                          Plaintiff,                    **MEMORANDUM & ORDER**
                                                        13-CV-965 (MKB)
              v.

NEW YORK HOSPITAL MEDICAL CENTER OF
QUEENS,

                          Defendant.

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiff Magaly Bernadotte commenced the above-captioned action on February 22,

2013, against Defendant New York Hospital Medical Center of Queens, (Compl., Docket Entry

No. 1), and filed an Amended Complaint on June 12, 2013, (Am. Compl., Docket Entry No. 12),

alleging disability discrimination in violation of the Americans with Disabilities Act of 1990,

42 U.S.C. § 12101 *et seq.* ("ADA"), the New York State Human Rights Law, N.Y. Exec. Law

§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code

§ 8-101 *et seq.* ("NYCHRL").  On August 15, 2013, Defendant moved to dismiss the Amended

Complaint.  (Def. Mot. to Dismiss, Docket Entry No. 16.)  At oral argument held on February

10, 2014, the Court granted in part and denied in part Defendant's motion to dismiss the

Amended Complaint and granted Plaintiff leave to further amend the Amended Complaint.

(Feb. 10, 2014 Min. Order.)  The Court explained its reasoning in a Memorandum and Order

dated February 28, 2014.  *Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens*, No. 13-CV-965, 2014

WL 808013 (E.D.N.Y. Feb. 28, 2014).  On February 24, 2014, Plaintiff filed a Second Amended

Complaint (the "SAC").  (SAC, Docket Entry No. 22.)  Defendant moves for summary judgment

dismissing the SAC in its entirety.  (Mot. for Summ. J., Docket Entry No. 60.)  For the reasons set forth below, the Court grants Defendant's motion for summary judgment.

## I.  Background

Defendant employed Plaintiff as an emergency department technician.[1]  (Def. Local Rule 56.1 Statement of Material Facts ("Def. 56.1") ¶ 26, Docket Entry No. 66; Pl. Resps. in Opp'n to Def. 56.1 ("Pl. 56.1") ¶ 26, Docket Entry No. 60-3.)  Plaintiff's employment commenced on or about January 23, 2006, and continued through July 25, 2011 when Defendant terminated Plaintiff's employment.  (Def. 56.1 ¶¶ 18, 225; Pl. 56.1 ¶¶ 18, 225.)  Plaintiff claims that she was terminated because of her disability caused by diabetes.  (Pl. 56.1 ¶ 284.)  Defendant contends that it terminated Plaintiff because Plaintiff "fraudulently used sick leave, including paid sick leave benefits, to obtain unscheduled time off from work in order to perform clinical rotations at another hospital."  (Def. 56.1 ¶ 230.)

### a.  Plaintiff's employment

As a technician, Plaintiff's duties included performing telemetry,[2] assisting with electrocardiograms ("EKGs"), drawing blood and providing patient care.  (Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27.)  Plaintiff performed her telemetry duties from a seated position, (Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29), but performed other duties from a standing position, (Pl. 56.1 ¶ 29).

On January 4, 2007, Plaintiff requested a transfer to a part-time technician position because of her school schedule and because she was having difficulty working on a full-time basis, attending school and managing her diabetes.  (Def. 56.1 ¶¶ 33–34; Pl. 56.1 ¶¶ 33–34; Ltr.

___

[1]  Plaintiff was initially hired as a certified nurse assistant, (Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18), but was promoted to an emergency department technician within "a few weeks" of being hired, (Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26).

[2]  Telemetry involves sitting and observing a monitor that displays the cardiac rhythms of patients.  (Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.)

dated Jan. 4, 2007, annexed to Decl. of Suzanne Pugh ("Pugh Decl."), Docket Entry No. 64, as Ex. L.) Defendant granted Plaintiff's request on April 15, 2007. (Def. 56.1 ¶ 38; Pl. 56.1 ¶ 38.)

On August 4, 2007, Plaintiff asked Defendant not to assign her to work on Tuesdays during the month of September because of a conflict with her school schedule.[3] (Ltr. dated Aug. 4, 2007, annexed to Pugh Decl. as Ex. N.) Plaintiff does not recall whether Defendant granted the request, (Dep. of Magaly Bernadotte ("Pl. Dep.") 53:6–13, annexed to Decl. of Tara Eyer Daub ("Eyer Daub Decl.") as Ex. E, Docket Entry No. 65), but Defendant believes it did, (Pugh Decl. ¶ 25).

### b. Defendant's sick leave, medical leave and attendance policies

As part of its process for hiring new employees, Defendant requires applicants to disclose any job-related disabilities. (Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.) If Defendant's employees are unable to work for five working days or more, they must submit documentation from a physician regarding the illness or injury that prevents them from working and the date on which the employee will return to work. (Def. 56.1 ¶¶ 7–8; Pl. 56.1 ¶¶ 7–8.) Employees who are unable to work for four working days or less may request days off from work without any documentation from a physician. (Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9.) Employees are not permitted to use sick leave for any reason other than illness or injury, and they are required to accurately record sick leave. (Def. 56.1 ¶¶ 12–13; Pl. 56.1 ¶¶ 12–13.) If employees fail to comply with Defendant's attendance policies, such as the sick leave or medical leave policies, they may be subject to discipline, including termination.[4] (Def. 56.1 ¶¶ 15–16; Pl. 56.1 ¶¶ 15–16.) Prior to taking any disciplinary

---

[3] Part-time employees have the opportunity to select the days they were unavailable to work. (Def. 56.1 ¶ 47; Pl. 56.1 ¶ 47.)

[4] The Court rejects Plaintiff's argument that the statements regarding Defendant's sick leave and medical leave policies should be excluded pursuant to Rule 403 of the Federal Rules of

action, Defendant may provide notice to an employee whose conduct or performance is unsatisfactory by issuing a counseling memorandum. (Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58.)

### c. Plaintiff's attendance record

Between 2007 and 2010, Defendant documented excessive absences by Plaintiff in her performance evaluation and disciplined Plaintiff with two verbal warnings and one written warning. In Plaintiff's 2007 performance evaluation, Defendant noted Plaintiff's "excessive absences" and informed Plaintiff that she was expected "to follow and abide by [the] current policy for attendance." (2007 Performance Planning and Appraisal Form at NYHQ 000378, annexed to Pugh Decl. as Ex. O.) On May 16, 2008, Defendant issued a counseling memorandum to Plaintiff, which noted that Plaintiff had been absent four times, and warned her that she may be subjected to disciplinary action as a result of her "excessive absenteeism." (Counseling Mem., annexed to Pugh Decl. as Ex. P.) Subsequently, on July 18, 2008, after Plaintiff had been absent for two additional days, Defendant gave Plaintiff a verbal warning for her continued absenteeism. (Record of Offense and Warning dated July 18, 2008 ("July 18, 2008 Warning"), annexed to Pugh Decl. as Ex. Q.) Plaintiff signed a written record acknowledging receipt of the July 18, 2008 warning and acknowledging that failure to improve would result in termination. (July 18, 2008 Warning.) Under the "Employee Explanation/Comments" section of the record, Plaintiff apologized for having to "call out" because she was "sick," and explained that she had difficulty complying with the "Company Policy" because of her diabetes. (*Id.*) On February 15, 2010, after Plaintiff was "sick" on four occasions during a three-month period, Defendant gave Plaintiff another verbal warning for her

---

Evidence, which provides for the exclusion of evidence if its probative value is substantially outweighed by unfair prejudice, confusion of the issues, and other grounds. (Pl. 56.1 ¶¶ 1, 6–9, 12–13, 15–16.) Plaintiff provides no such basis to exclude the statements.

"[f]ailure to adhere to [the] attendance policy." (Record of Offense and Warning dated Feb. 15, 2010, annexed to Pugh Decl. as Ex. S.)

### d. Plaintiff's nursing program

In January of 2009, Plaintiff enrolled in a full-time nursing program at Adelphi University.[5] (Def. 56.1 ¶ 70; Pl. 56.1 ¶ 70.) During the 2009 spring and fall semesters, Plaintiff was enrolled in classes with a total of fourteen credits, but she did not participate in any clinical rotations. (Def. 56.1 ¶¶ 72–73; Pl. 56.1 ¶¶ 72–73.) During the 2010 spring semester, Plaintiff was enrolled in classes with a total of fourteen credits, and she completed a total of 135 hours of clinical rotation. As part of her clinical rotations, Plaintiff followed and observed a registered nurse, known as a preceptor, throughout the nurse's regular shift. (Def. 56.1 ¶ 81; Pl. 56.1 ¶ 81.)

On January 3, 2010, Plaintiff and another technician jointly requested a schedule change from Defendant to accommodate Plaintiff's schedule at Adelphi University. (Def. 56.1 ¶ 81; Pl. 56.1 ¶ 81.) The request was memorialized in a signed letter directed to, among others, Barbara Bird, the Nurse Manager of Plaintiff's division. (Def. 56.1 ¶ 82; Pl. 56.1 ¶ 82.) Defendant granted the request. (Def. 56.1 ¶ 85; Pl. 56.1 ¶ 85.)

During the 2010 summer and fall semesters and the 2011 spring semester, Plaintiff continued to participate in her nursing program and clinical rotations. (Def. 56.1 ¶¶ 89, 90, 95; Pl. 56.1 ¶¶ 89, 90, 95.) During the 2011 summer semester, Plaintiff was enrolled in nursing classes with a total of ten credits, and she completed 200 hours of clinical rotations. (Def. 56.1 ¶¶ 98, 101; Pl. 56.1 ¶¶ 98, 101.) Her classes met on Wednesdays from 6:00 PM to 10:00 PM and Mondays from 2:30 PM to 6:00 PM. (Def. 56.1 ¶¶ 99, 100; Pl. 56.1 ¶¶ 99, 100.)

---

[5] Defendant reimbursed Plaintiff's tuition each year she attended the nursing program. (Def. 56.1 ¶ 71; Pl. 56.1 ¶ 71.)

Plaintiff graduated from her nursing program in August of 2011. (Def. 56.1 ¶ 106; Pl. 56.1 ¶ 106.)

### e. The summer of 2011

In order to graduate from her nursing program, Plaintiff was required to complete 200 hours of clinical rotations during the summer of 2011. (Def. 56.1 ¶¶ 104–05; Pl. 56.1 ¶¶ 104–05.) Plaintiff completed these hours by performing clinical rotations in the surgical intensive care unit of North Shore University Hospital. (Def. 56.1 ¶ 107; Pl. 56.1 ¶ 107.) Plaintiff tracked her hours by entering them in a log sheet. (Def. 56.1 ¶ 109; Pl. 56.1 ¶ 109; Clinical Hours Log Sheet, annexed to Eyer Daub Decl. as Ex. J.) Plaintiff completed these hours over the course of seventeen twelve-hour shifts, one eight-hour shift, and one sixteen-hour shift during the period from June 3, 2011 through July 31, 2011. (Clinical Hours Log Sheet.) During her clinical rotations, Plaintiff "assessed patients, administered medication, assisted with wound care, assisted with patients on the ventilator, assisted with colostomy and ileostomy care, and observed her preceptor perform intake and output of patients, monitor blood glucose of patients, perform tracheotomy care and suction patients." (Def. 56.1 ¶ 114; Pl. 56.1 ¶ 114.) Plaintiff performed these tasks while standing. (Def. 56.1 ¶ 115; Pl. 56.1 ¶ 115.) According to Plaintiff, "she did not have much physical stamina in the Summer of 2011 but she forced herself [to perform these tasks] when necessary."[6] (Pl. 56.1 ¶ 117.)

During the months of June and July of 2011, Defendant paid Plaintiff for five days of sick leave. (Def. 56.1 ¶ 119; Pl. 56.1 ¶ 119.) After exhausting her paid sick leave, Plaintiff

---

[6] An entry in Plaintiff's resume regarding her clinical rotations during the summer of 2011 states that she demonstrated "physical stamina and manual dexterity to perform a variety of tasks." (Magaly Marie Bernadotte Resume, attached to Eyer Daub Decl. as Ex. K.)

presented notes from her doctors explaining that she was unable to work, and Defendant allowed Plaintiff to use nine unpaid days of medical leave. (Def. 56.1 ¶ 120; Pl. 56.1 ¶ 120.)

Plaintiff submitted a doctor's note dated June 13, 2011 which stated that, because of her "severe headache[s]," Plaintiff should be excused from work from June 7, 2011 through June 12, 2011, returning to work on June 13, 2011. (Ltr. dated June 13, 2011, annexed to Pugh Decl. as Ex. U.) According to Plaintiff, her headaches "caused her blurred vision and trouble focusing, which prevented her from driving to work and made it difficult for her to focus at work." (Def. 56.1 ¶ 126; Pl. 56.1 ¶ 126.) Plaintiff also suffered from "swollen feet," which rendered her unable to stand and prevented her from working. (Def. 56.1 ¶ 128; Pl. 56.1 ¶ 128.) On June 8, 2011, while she was on paid sick leave, Plaintiff completed an eight-hour shift as part of her clinical rotation. (Def. 56.1 ¶ 132; Pl. 56.1 ¶ 132; Clinical Hours Log Sheet).

On June 15, 2011, Plaintiff returned to work and completed a full shift. (Def. 56.1 ¶ 136; Pl. 56.1 ¶ 136.) Thereafter, Plaintiff worked according to her usual schedule without restrictions through June 29, 2011. (Def. 56.1 ¶ 139–40, 142–45; Pl. 56.1 ¶ 139–40, 142–45.)

On June 30, 2011, Plaintiff submitted a doctor's note excusing her from work during the period from June 30, 2011 through July 7, 2011. (Def. 56.1 ¶ 146; Pl. 56.1 ¶ 146.) The note stated that Plaintiff could return to work with full duties on July 7, 2011. (Ltr. dated June 30, 2011, annexed to Pugh Decl. as Ex. V.) Plaintiff testified at her deposition that she suffered from swollen feet during this time and was unable to stand for extended periods as a result. (Pl. Dep. 126:4–11, 126:18–21.) On July 2 and 4, 2011, while on paid sick leave from Defendant, Plaintiff participated in clinical rotations, completing a sixteen-hour shift and a twelve-hour shift, respectively. (Def. 56.1 ¶¶ 152–53; Pl. 56.1 ¶¶ 152–53; Clinical Hours Log Sheet.)

Plaintiff submitted a doctor's note dated July 7, 2011, which stated that Plaintiff would be under the care of a doctor beginning July 7 and until "further notice." (Ltr. dated July 7, 2011, annexed to Pugh Decl. as Ex. W.) The note also stated that Plaintiff would be able to return to work within one week "after seeing [the] doctor."[7] (*Id.*) On July 9, 10, 16 and 17, 2011, while on unpaid medical leave, Plaintiff participated in clinical rotations and completed a twelve-hour shift on each of these days. (Def. 56.1 ¶¶ 163–64, 166–67; Pl. 56.1 ¶¶ 163–64, 166–67; Clinical Hours Log Sheet.)

On July 21, 2011, Plaintiff submitted a doctor's note excusing her from work during the period from July 21, 2011 through July 31, 2011, returning to work on August, 1, 2011. (Def. 56.1 ¶ 169; Pl. 56.1 ¶ 169.) Within this period, on July 23, 24 and 31, 2011, Plaintiff participated in clinical rotations and completed a twelve-hour shift on each of the three days. (Clinical Hours Log Sheet.) On July 31, 2011, Plaintiff completed her clinical rotations. (Def. 56.1 ¶ 172; Pl. 56.1 ¶ 172.)

### f. Plaintiff's termination

On July 21, 2011, Bird met with Suzanne Pugh, Defendant's Clinical Director of Patient Care Services, and told Pugh that Plaintiff had been absent from work since June 30, 2011, and had been submitting doctor's notes to explain her absence. (Def. 56.1 ¶ 182; Pl. 56.1 ¶ 182.) Bird also told Pugh that Plaintiff had been participating in clinical rotations at another hospital while she was absent from work. (Def. 56.1 ¶ 188; Pl. 56.1 ¶ 188.) Pugh subsequently emailed Plaintiff and asked her to call Bird to discuss her absences. (Def. 56.1 ¶ 194; Pl. 56.1 ¶ 194.)

---

[7] Plaintiff argues that she was continuously under the care of her doctors from June 30, 2011 through July 21, 2011, and that Defendant mischaracterizes the letters by separately considering them. (Pl. 56.1 ¶ 156.) The Court relies on the contents of the letters.

On July 22, 2011, Plaintiff called Bird while Bird was in Pugh's office. (Def. 56.1 ¶ 196; Pl. 56.1 ¶ 196.) Pugh placed the call on speakerphone and informed Plaintiff that Bird and another employee were also on the call. (Def. 56.1 ¶¶ 197–98; Pl. 56.1 ¶¶ 197–98.) Pugh asked Plaintiff if she performed clinical rotations while using sick leave and medical leave, and Plaintiff confirmed that she had participated in clinical rotations while on sick leave and medical leave. (Def. 56.1 ¶¶ 199–200; Pl. 56.1 ¶¶ 199–200.) Pugh told Plaintiff that her actions were fraudulent because she could not receive paid sick leave while completing clinical rotations at another hospital and that she could not continue to use sick leave in this manner.[8] (Def. 56.1 ¶¶ 201, 203; Pl. 56.1 ¶¶ 201, 203.) Plaintiff testified at her deposition that, because Pugh demanded her resignation and threatened to prosecute her for fraud, (Pl. Dep. 154:23–155:7), she resigned from her position, (*id.* at 155:7).

Shortly after their conversation, Pugh sent Plaintiff an email memorializing her admission that she had performed clinical rotations at another hospital while on sick leave and medical leave and accepting Plaintiff's resignation. (Def. 56.1 ¶ 210; Pl. 56.1 ¶ 210; Email dated July 22, 2011, annexed to Pugh Decl. as Ex. Y.) Plaintiff replied to the email stating that she had been forced to resign and that she would not have done so had she been afforded "time to think," and stating that she had previously overheard Bird tell other employees that Bird wanted Plaintiff to resign because she was no longer willing to accommodate Plaintiff's school schedule.[9] (Def.

---

[8] Plaintiff contends that she did not commit fraud but does not otherwise dispute the statement. (Pl. 56.1 ¶¶ 201.)

[9] Plaintiff cannot recall when, or to whom, this comment was made and concedes that she never complained to anyone about the comment. (Def. 56.1 ¶¶ 214–17; Pl. 56.1 ¶¶ 214–17.) Plaintiff also concedes that Bird did not make any remarks about Plaintiff's diabetes or her use of sick leave. (Def. 56.1 ¶ 214; Pl. 56.1 ¶ 214.)

56.1 ¶¶ 211–13; Pl. 56.1 ¶¶ 211–13.)  Plaintiff also stated in her email response that Defendant "was exercising a pattern of forcing employees to resign."[10] (Def. 56.1 ¶ 218; Pl. 56.1 ¶ 218.)

Pugh responded to Plaintiff's email stating that she was not aware of Plaintiff's issues with Bird and that Plaintiff's resignation was the result of her admission that she had used sick leave to perform clinical rotations.  (Def. 56.1 ¶ 222; Pl. 56.1 ¶ 222.)  Pugh also wrote that it was not her intention to threaten or force Plaintiff to resign, and she offered Plaintiff additional time to think about her decision.  (Def. 56.1 ¶ 223; Pl. 56.1 ¶ 223.)

On July 23, 2011, Plaintiff wrote a letter to Pugh rescinding her resignation.  (Def. 56.1 ¶ 225; Pl. 56.1 ¶ 225; Ltr. dated July 23, 2011, annexed to Pugh Decl. as Ex. Z.)  On July 25, 2011, Pugh decided to fire Plaintiff and wrote a letter to Plaintiff terminating her employment. (Def. 56.1 ¶¶ 227–28; Pl. 56.1 ¶¶ 188, 227–28; Ltr. dated July 25, 2011, annexed to Pugh Decl. as Ex. AA.)  The letter stated that Plaintiff's employment was being terminated because she had admitted to using sick leave to complete her clinical rotations.  (Ltr. dated July 25, 2011.)

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 230 (2d Cir. 2015); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a

---

[10]  Plaintiff admits that she does not know of any other employee forced to resign and does not believe that Defendant forced employees to resign on the basis of their disabilities. (Def. 56.1 ¶¶ 219–20; Pl. 56.1 ¶¶ 219–20.)

genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015)

(quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); then citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is

sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477

U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary

judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and

drawing all inferences in favor of the non-moving party, a rational juror could find in favor of

that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has

cautioned that "[w]here an employer acted with discriminatory intent, direct evidence of that

intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for

circumstantial proof which, if believed, would show discrimination." *Taddeo v. L.M. Berry &*

*Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596

F.3d 93, 101 (2d Cir. 2010)).

### b. ADA and NYSHRL discrimination claims

Plaintiff contends that Defendant terminated her employment because of her disability in

violation of the ADA and the NYSHRL. Under the ADA, employers may not "discriminate

against a qualified individual on the basis of disability" in making employment decisions. *See*

42 U.S.C. § 12112. Claims of employment discrimination under the ADA are assessed using the

burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973). [11] *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015)

---

[11] "A claim of disability discrimination under the New York State Human Rights
Law . . . is governed by the same legal standards as govern federal ADA claims." *Noll v. Int'l*
*Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (alteration in original) (quoting *Graves v.*
*Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006). Thus, Plaintiff's "state-law

(per curiam) (citing *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)).

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination. *Cortes*, 802 F.3d at 231. If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* The defendant's burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010), *aff'd*, 461 F. App'x 59 (2d Cir. 2012). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). If the defendant offers a legitimate, nondiscriminatory explanation for its action, summary judgment must still be denied, however, if the plaintiff can show that the explanation was a pretext. *See Davis*, 804 F.3d at 235 ("[O]nce the employer has set forth its non-discriminatory justification, the plaintiff must then produce evidence capable of carrying the burden of persuasion that the employer's action was at least in part motivated by discrimination."[12] (first citing *Reeves*, 530 U.S. at 142; and then citing *St. Mary's*, 509 U.S. at 509)).

---

disability-discrimination claim . . . survives or fails on the same basis as [her] ADA claim." *Graves*, 457 F.3d at 184 n.3.

[12] The question of whether a plaintiff need only show that her disability was a "motivating factor" in causing the adverse action, as in Title VII cases, or whether she must show that it was the "but-for" cause of the adverse action, as in ADEA cases, is an open question in the Second Circuit. *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 175–76 (D. Conn. 2015) (citation omitted); *Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 348 (E.D.N.Y. 2014) (quoting *Castro v. City of New York*, 24 F. Supp. 3d 250, 269 n.34 (E.D.N.Y. 2014)); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. Sept. 2, 2015*)* (noting that a plaintiff alleging age discrimination must allege that age was the but-for cause of the adverse action (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009))). Because the Court concludes that Plaintiff fails to establish that Defendant's action was discriminatory under the more forgiving "motivating factor" standard, the Court declines to determine whether the "but-for" standard applies.

Defendant argues that Plaintiff has not established a prima facie case of disability discrimination because (1) Plaintiff was not disabled under the ADA, (2) Defendant had no notice of Plaintiff's alleged disability, and (3) Plaintiff has not raised an inference of discrimination. (Def. Mem. 4.) Defendant further argues that Plaintiff has not demonstrated that Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff's employment was pretext. (*Id.*) Plaintiff argues that (1) she was disabled as a result of her diabetes, (2) Defendant knew of her disability, and (3) she did not fraudulently misuse sick leave.[13] (Pl. Mem. 13–15.)

### i. Prima facie case of disability discrimination

To establish a prima facie case of discrimination under the ADA, a plaintiff must establish that "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the

---

[13] In her papers in opposition to Defendant's motion for summary judgment, Plaintiff appears to assert a failure to accommodate claim. (Pl. Mem. 11 ("In so-called reasonable-accommodation cases, such as this one . . . .").) However, because Plaintiff did not assert a failure to accommodate claim in the SAC, she may not raise this new claim in opposing summary judgment. *See McCoy v. Morningside at Home*, 601 F. App'x 57, 58 (2d Cir. 2015) (affirming district court's holding that plaintiff "improperly raised [a] claim for the first time in opposing summary judgment" (citing *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006)). Even if the Court were to entertain such a claim, it would nevertheless fail because Plaintiff has not shown that she made any request for an accommodation that was denied by Defendant. *See Dooley v. JetBlue Airways Corp.*, --- F. App'x ---, ---, 2015 WL 9261293, at *2 (2d Cir. Dec. 18, 2015) (stating that an employer's refusal to make an accommodation is an element of a failure to accommodate claim and that the plaintiff "fail[ed] to satisfy [this element], as an employer cannot 'refuse to make an accommodation' that it was never asked to make (alterations omitted) (quoting *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013))). Indeed, Plaintiff testified at her deposition that she never requested an accommodation for her diabetes, (Pl. Dep. 220:7–11), and Defendant granted Plaintiff's requests for schedule changes, (Def. 56.1 ¶ 260; Pl. 56.1 ¶ 260). *See Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 407 (S.D.N.Y. 2007) ("It is settled that an employee cannot hold an employer liable for failing to provide an accommodation that the employee has not requested in the first place." (quoting *Falchenberg v. N.Y.C. Dep't of Educ.*, 375 F. Supp. 2d 344, 348 (S.D.N.Y. 2005)); *see also McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009) (affirming summary judgment because the plaintiff had failed to meet her "burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment").

meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability." *Davis*, 804 F.3d at 235 (citation omitted). "[A] plaintiff must show that the adverse employment action 'took place under circumstances giving rise to an inference of discrimination.'" *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)); *Dooley v. JetBlue Airways Corp.*, --- F. App'x ---, ---, 2015 WL 9261293, at *4 (2d Cir. Dec. 18, 2015) ("[A] plaintiff must still 'demonstrate that she suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent' under the former statute." (alterations omitted) (quoting *Cortes*, 802 F.3d at 231)).

Defendant does not dispute that it is covered by the ADA, that Plaintiff was qualified for her job, or that Plaintiff suffered an adverse employment action. (*See* Def. Mem. 10.) However, Defendant disputes that Plaintiff was either disabled or perceived to be disabled, that it had notice of Plaintiff's alleged disability, and that Plaintiff was terminated because of her alleged disability.

### 1. Plaintiff's disability

Defendant argues that Plaintiff is not disabled because she has failed to establish that her diabetes substantially limited any major life activities. (Def. Mem. 11.) Plaintiff contends she has satisfied this element because her medical records establish that she suffers from diabetes and, as a result, Plaintiff has impaired vision, chronic head pain, and difficulty standing and walking for extended periods of time. (Pl. Mem. 13–14.)

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or

(C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include standing, lifting, bending, speaking and working. *Id.* § 12102(2)(A). Under the EEOC's regulations, "substantially limits" must be "construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA' and 'is not meant to be a demanding standard.'" *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 69 n.3 (2d Cir. 2014) (quoting 29 C.F.R. § 1630.2(j)(1)(i)); *see also Dooley*, --- F. App'x at ---, 2015 WL 9261293, at *5 (quoting 42 U.S.C. § 12102(4)(A)). As a result, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Parada*, 753 F.3d at 68 n.3 (quoting 29 C.F.R. § 1630.2(j)(1)(ii)); *see also Dooley*, --- F. App'x at ---, 2015 WL 9261293, at *5 (quoting *Parada*, 753 F.3d at 68 n.3).

There is a disputed issue of fact as to whether Plaintiff was disabled precluding summary judgment. Plaintiff's deposition testimony and the notes from her doctors support her claim that, as a result of her diabetes, she suffered from headaches that prevented her from working and leg pain that made it difficult to stand. (Def. 56.1 ¶¶ 126, 128, 169; Pl. 56.1 ¶¶ 126, 128, 169; Ltr. dated June 13, 2011; Ltr. dated July 7, 2011.) Because standing and working are major life activities, the inability to do either could render Plaintiff disabled. Although Defendant has presented evidence that Plaintiff performed her job as a technician from a seated position, (Def. 56.1 ¶ 29), Defendant has also presented evidence that Plaintiff performed clinical rotations while standing, (*id.* ¶ 115), which suggests that Plaintiff could perform work while standing, despite her diabetes. Construing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff was disabled.

## 2.  Notice of disability

Defendant argues that Plaintiff failed to show that it had notice of her alleged disability. (Def. Mem. 14.)  Plaintiff contends that Defendant had notice of her diabetes and the related symptoms from which she suffered.  (Pl. Mem. 14.)

In order to survive a motion for summary judgment, a plaintiff must "adduce evidence raising a material issue of fact regarding [the] defendant's knowledge of her disability." *Volmar v. Cold Spring Hills Ctr. for Nursing & Rehab.*, 395 F. App'x 795, 796 (2d Cir. 2010); *see also Mitchell v. Shane*, 350 F.3d 39, 48–49 (2d Cir. 2003) (holding, in the Title VII context, that the plaintiffs failed to establish a prima facie case "because there is no evidence that the [defendants] had any knowledge of the [plaintiffs'] racial background").  "The notice requirement is rooted in common sense.  Obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (quoting *Felix v. N.Y.C. Transit Auth.*, 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001)); *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) (noting the impossibility of an employer basing an adverse employment decision on disability if it were "truly unaware that such a disability existed"); *McCoy v. Morningside at Home*, No. 11-CV-2575, 2014 WL 737364, at *4 (S.D.N.Y. Feb. 25, 2014) ("[C]ausation[] necessarily incorporates an inquiry as to whether the employer had notice of the plaintiff's disability."), *aff'd*, 601 F. App'x 57 (2d Cir. 2015).  Moreover, "[a]n employer's awareness that a plaintiff suffered some injury does not establish that an employer had notice that the plaintiff was disabled." *McCoy*, 2014 WL 737364, at *4.

Plaintiff has presented evidence that she informed various employees, including supervisory personnel, of her diabetes and the physical limitations she suffered from as a result.

For example, on January 4, 2007, Plaintiff sent a letter to Pugh, the Clinical Director of Patient Care Services, stating that it was difficult for Plaintiff to work on a full-time basis, in part, because of her diabetes, which was causing her health to deteriorate. (Ltr. dated January 4, 2007.) Similarly, in the written record memorializing the July 18, 2008 warning, Plaintiff wrote that it was difficult for her to comply with Defendant's attendance policy because of her diabetes. (July 18, 2008 Warning 1.) In addition, Plaintiff gave Defendant multiple notes from her doctors stating that Plaintiff was suffering from headaches and was otherwise unable to work. (Ltr. dated June 13, 2011; Def. 56.1 ¶¶ 146, 169; Pl. 56.1 ¶¶ 146, 169). Plaintiff also testified at her deposition that it was generally known among her coworkers and supervisors, including Bird, that she was forced to take time off from work to recover from the symptoms of her diabetes. (Pl. 56.1 ¶ 206.) Construing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant knew of Plaintiff's disability.

### 3. Inference of discrimination

Defendant argues that Plaintiff has presented only "generalized assertions of discrimination" and has not raised an inference of discrimination. (Def. Mem. 17–18.) Plaintiff has not responded to this argument.

Whether facts give rise to an inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). In the context of Title VII discrimination, the Second Circuit has noted that "[a]n inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable

treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). "In determining whether a genuine issue of material fact exists for trial," a court is obliged to carefully "distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

Remarks made by coworkers may be probative of discriminatory intent, depending on the particular circumstances under which the comments were made. *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (outlining four factors district courts in this circuit routinely consider in evaluating the probative value of such remarks, including (1) the identity and position of the individual making the remark, (2) the timing of the remark in relation to the employment decision, (3) the content of the remark, and (4) the context in which it was made); *Mesias v. Cravath, Swaine & Moore LLP*, --- F. Supp. 3d ---, ---, 2015 WL 2069419, at *6 (S.D.N.Y. May 4, 2015) ("Remarks may raise an inference of discrimination if there is a nexus between the remarks and an adverse employment decision." (citing *Zhang v. Barr Labs., Inc.*, No. 98-CV-5717, 2000 WL 565185, at *4 (S.D.N.Y. May 8, 2000))).

Plaintiff claims that Pugh terminated her employment because Pugh "was dissatisfied with [Plaintiff] taking time off to recuperate as an accommodation for her disability." (Pl. Mem. 6.) However, Plaintiff has failed to present any evidence that supports an inference of such discriminatory animus. Plaintiff has presented no evidence that she was treated less favorably than similarly-situated employees or that Defendant made invidious comments about disabled or diabetic persons. In addition, Plaintiff concedes that no one made any derogatory comments or

remarks regarding Plaintiff's diabetes.  (Def. 56.1 ¶ 286; Pl. 56.1 ¶ 286.)  The only comment Plaintiff references is Bird's comment to an employee that Defendant would no longer accommodate Plaintiff's part-time schedule.  (Pl. Dep. 161:5–162:10.)  This comment does not support an inference of discrimination.  Although the comment was made by Bird, a supervisor, Plaintiff does not recall when or to whom the comment was made or whether anyone else heard the comment.  (*Id.* at 161:12–18; 162:11–16, 162:23–163:13.)  Moreover, neither the remark itself nor the context in which it was made support an inference of discrimination.  It is undisputed that Plaintiff was working part-time in order to attend school, (*see* Pl. 56.1 ¶¶ 212–14; Def. 56.1 ¶¶ 212–14), and as she testified, Plaintiff understood Bird's comment to be based on Bird's desire to stop accommodating Plaintiff's school schedule, (Pl. Dep. 161:23–162:10).

Even assuming Bird's comment was discriminatory, because Plaintiff has failed to show any connection between the comment and her termination, she fails to present evidence from which a jury could infer discrimination.  Plaintiff concedes that Pugh, not Bird, made the decision to terminate Plaintiff's employment, (Def. 56.1 ¶¶ 272, 275; Pl. 56.1 ¶¶ 272, 275), and Plaintiff has not presented any evidence that Pugh was aware of Bird's statement.  Plaintiff has therefore failed to provide any evidence from which a reasonable jury could infer that she was terminated because of any alleged disability discrimination and fails to establish a prima facie case of disability discrimination.  Defendant is therefore entitled to summary judgment.

### ii.   Legitimate nondiscriminatory reason

Even assuming that Plaintiff could establish a prima facie case of disability discrimination, Defendant proffered a legitimate, nondiscriminatory reason for terminating Plaintiff's employment.  According to Defendant, Plaintiff was terminated because Defendant "determined that Plaintiff violated its policies and engaged in fraud by using sick days to

perform clinical rotations at another hospital." (Def. Mem. 20.) This is a legitimate nondiscriminatory reason for Plaintiff's termination. *See also Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 169 (2d Cir. 2001) ("[I]t is common sense and entirely lawful for an employer to select for termination an employee who the employer in good faith believes recently engaged in fraud relating to the employment."); *Cusack v. News Am. Mktg. In-Store Servs. L.L.C.*, No. 06-CV-6166, 2008 WL 2663001, at *4 (S.D.N.Y. July 2, 2008) ("[The defendant] has met its burden of putting forth a legitimate, nondiscriminatory reason for [the plaintiff's] termination — specifically, its belief that [the plaintiff] was acting dishonestly and fraudulently in attempting to manipulate [the defendant's] disability benefits policy."), *aff'd sub nom. Cusack v. News Am. Mktg. In-Store, Inc.*, 371 F. App'x 157 (2d Cir. 2010).

### iii.  Pretext

Plaintiff argues that Defendant's nondiscriminatory reason for her termination is a pretext because she did not actually commit fraud. (Pl. Mem. 14–15.) Defendant argues that whether Plaintiff actually committed fraud is not relevant to whether its nondiscriminatory reason is a pretext, and also argues that Plaintiff's credibility challenges are not evidence of pretext. (Def. Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Def. Reply") 8–9.)

To show pretext, a plaintiff must "present evidence from which a fact-finder could reasonably conclude that the [defendant's] reason was pretextual and that the real reason was discrimination." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 317 (2d Cir. 1999) (citing *St. Mary's*, 509 U.S. at 507–08). Evaluating whether the defendant's nondiscriminatory reason is a pretext involves "factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated

only after the allegation of discrimination." *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993) (collecting cases); *Xu-Shen Zhou v. State Univ. of N.Y. Inst. of Tech.*, 499 F. App'x 105, 109 (2d Cir. 2012) (quoting *DeMarco*, 4 F.3d at 171). However, when making this assessment, courts "are decidedly not interested in the truth of the allegations against [the] plaintiff" but rather "are interested in what *motivated* the employer." *Mathew v. N. Shore-Long Island Jewish Health Sys., Inc.*, 582 F. App'x 70, 71 (2d Cir. 2014) (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 44 (2d Cir. 2000) (holding that the plaintiff could not establish pretext by demonstrating that the results of a failed drug test were not "actually correct" because "[t]he key question is whether it was reasonable for the employer to rely on the test result in making its employment decision"); *Hartley v. Rubio*, 785 F. Supp. 2d 165, 177 (S.D.N.Y. 2011) ("In determining whether the articulated reason for the action is a pretext, 'a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action.'" (quoting *DeMarco*, 4 F.3d at 170–71)).

Plaintiff argues that her actions were not fraudulent because she was not "working" while she performed her clinical rotations and because her medical records confirm that she was sick during the period of time that Defendant believes Plaintiff fraudulently used sick leave to complete her clinical rotations at another hospital. (Pl. Mem. 14–15.) However, Plaintiff admits that she completed her clinical rotations while using sick leave, (Pl. Dep. 157:25–158:5; 185:11–21), and therefore cannot dispute the factual basis for Defendant's decision to terminate her. As discussed above, the issue is not whether Plaintiff actually committed fraud, but rather whether Defendant believed Plaintiff committed fraud by performing clinical rotations at another

hospital on days she was on sick leave and medical leave and terminated her because of that belief. *See Roge*, 257 F.3d at 169 ("Whether or not fraud actually occurred, questionable circumstances surrounding an employee's claim for benefits provide a nondiscriminatory reason for choosing to terminate that employee . . . ."); *Cusack*, 2008 WL 2663001, at *5 ("[T]he issue here is not whether [the plaintiff] actually committed intentional dishonesty or fraud . . . or whether [the defendant's] zero-tolerance policy with regard to dishonesty is wise or fair. The question, rather, is whether [the defendant] has proffered a legitimate, non-discriminatory reason for firing [the plaintiff]."). Plaintiff has not offered any evidence that Defendant was motivated by anything other than its belief that Plaintiff committed fraud by conducting clinical rotations at another hospital while she was absent from work on sick leave. In addition, Plaintiff has not shown that Defendant's decision to terminate her under such circumstances is inconsistent with its sick leave or medical leave policies. Thus, Plaintiff cannot show pretext.

While Plaintiff has raised an issue of fact as to whether she was disabled and whether Defendant had notice of her disability, Plaintiff has failed to present evidence from which a reasonable jury could infer discrimination and, therefore, has not established a prima facie case of discrimination under the ADA. Moreover, even assuming Plaintiff could establish a prima facie case, her claims nevertheless fail because she has not presented any evidence from which a reasonable jury could conclude that Defendant's reason for terminating her was pretextual. The Court therefore grants Defendant's motion for summary judgment as to Plaintiff's ADA and NYSHRL claims.

### c. NYCHRL claim

Defendant argues that Plaintiff's NYCHRL disability claim should also be dismissed because she has failed to present any evidence from which a jury could conclude that

Defendant's legitimate, nondiscriminatory reason for terminating her employment was a pretext for discrimination. (Def. Mem. 25; Def. Reply 10.) Plaintiff argues that her NYCHRL claim must be analyzed separately from her state and federal claims and that she needs to show only differential treatment of any degree based on discrimination. (Pl. Mem. 10–11.)

"[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [its] provisions 'broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible.'" *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) (second alteration in original) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)). Although NYCHRL discrimination claims must be analyzed separately from federal and state discrimination claims, such claims are evaluated using a "similar framework." *Id.* "[T]he plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions." *Id.* (citing *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 124 (App. Div. 2011)). If the defendant meets that burden, then "summary judgment is appropriate if 'the record establishes as a matter of law' that discrimination *or* retaliation 'play[ed] no role' in the defendant's actions." *Id.* (first quoting *Mihalik*, 715 F.3d at 110 n.8; and then citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38, 40 n.27 (App. Div. 2009)). However, even under this more liberal standard, a plaintiff must "show that he 'has been treated less well at least in part "*because of*"' [his disability]." *Mathew*, 582 F. App'x at 71 (quoting *Mihalik*, 715 F.3d at 110); *see also White v. Andy Frain Servs., Inc.*, --- F. App'x ---, ---, 2015 WL 6684485, at *1 (2d Cir. Nov. 3, 2015) ("[T]hough we must construe NYCHRL claims more liberally than federal and state law claims, NYCHRL similarly only prohibits discrimination in the 'terms, conditions or privileges of employment' when such discrimination is 'because of' a protected characteristic." (quoting

N.Y.C. Admin. Code § 8-107(1)(a) and citing *Mihalik*, 715 F.3d at 109)).

As discussed above, Plaintiff has not presented any evidence from which a reasonable jury could conclude that Defendant terminated her employment for a reason other than Plaintiff's violation of Defendant's policies by performing her clinical rotations at another hospital while she was on sick leave and medical leave. Thus, the Court grants Defendant's motion for summary judgment as to Plaintiff's NYCHRL discrimination claim. *See Ya-Chen Chen*, 805 F.3d at 76 (affirming summary judgment where the plaintiff "has not presented evidence from which a reasonable jury could conclude that discrimination . . . played a role in [the defendants'] actions); *McDonnell v. Schindler Elevator Corp.*, 618 F. App'x 697, 700 (2d Cir. 2015) (affirming summary judgment where "the record is devoid of evidence suggesting that [the plaintiff's] termination was at all motivated by disability discrimination" (citing *Mihalik*, 715 F.3d at 116)); *Mihalik*, 715 F.3d at 116 (noting that "summary judgment is appropriate [for an NYCHRL claim] only if the plaintiff cannot show that [discrimination] played any part in the employer's decision").

## III. Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment. The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: February 26, 2016
     Brooklyn, New York